No. 38,421

TAYLOR HENDREN and GOLDIE HENDREN, *Appellees,* v. CITY OF KANSAS CITY, KANSAS, *Appellant.*

(238 P. 2d 510)

Opinion filed December 8, 1951.

*William H. Towers,* deputy city attorney, of Kansas City, argued the cause, and *Alton H. Skinner,* city attorney of Kansas City, and *C. W. Brenneissen, Jr., James J. Lysaught,* and *James H. Barnes,* deputy city attorneys of Kansas City, were with him on the briefs for the appellant.

*Donald C. Little,* of Kansas City, argued the cause, and *Frank L. Bates,* of Kansas City, and *Elgin T. Fuller* and *Ben Ely,* both of Hannibal, Mo., were with him on the briefs for the appellees.

The opinion of the court was delivered by

HARVEY, C. J.: Plaintiffs brought this action for damages for the alleged wrongful death of their son, Oscar Hendren, nine and one-half years of age. A jury trial resulted in judgment for plaintiffs and defendant has appealed.

The pertinent facts are not seriously controverted and may be summarized as follows: In 1903 the owners of real property near, but not within, the corporate limits of Kansas City platted the same into lots, blocks, streets and alleys as Marie Place. The plat was duly presented to and approved by the governing body of the city and was filed of record. In 1909 the city by ordinance extended its boundaries so as to include the platted property. Thereby the county became the owner of the title to the streets and alleys in trust for the purposes named and the city assumed the duty of their care and maintenance. Within the area is 16th street, which we shall call a north and south street although it is not truly so with the compass, and to the east of it is 13th street. An east and west street, Lathrop Avenue, extends from 13th to 16th street. The distance from the center of 16th to the center of 13th street along Lathrop Avenue is 490 feet. Intersecting Lathrop Avenue there is a deep ravine through which the city in 1935 laid a surface water sewer consisting of a forty-eight-inch corrugated pipe, which is exposed near the bottom of the ravine. The distance from the top of this pipe to the level of the street is 22.7 inches. The distance from the center of 16th street to the west edge of the ravine is 236 feet and from the east edge of the ravine to the center of 13th street the distance is 180 feet, making the ravine about 115 feet wide. Part way up the west side of the ravine there is a spring, over which someone years ago built a springhouse seventeen feet long north and south and thirteen feet wide, and open at one end. About one-third of the springhouse was situated in Lathrop Avenue and two-thirds on privately owned property. The walls of this were laid with good sized stones and lime mortar, which deteriorated, so some of the stones had fallen out of the wall and others were loose. The roof consisted of a cement slab six inches thick over the entire building. Years ago the water from this spring was used for household purposes by persons who lived in that vicinity, but the water was condemned by the city some years ago for such purposes and since that time the building has been unused. From the plat it

appears that this springhouse was built on lot 9 of block 5 of the addition. The record shows that on May 3, 1942, lots 8, 9 and 10 were deeded to Alice Hopewell, who held the title thereto at the time of the tragedy which gave rise to this action.

Sixteenth street is a paved street. Lathrop Avenue never had been paved, but had been graded and sanded from 16th to the west edge of the ravine, where there was a fence across the street. Along this part of Lathrop Avenue five residences facing it had been built, three on one side and two on the other. Thirteenth street had been paved from the south to the south line of Lathrop Avenue, where it had been barricaded. Lathrop Avenue never had been opened for travel from 13th street to the west edge of the ravine. No residences facing Lathrop Avenue had been built on that portion of the street and there had been no travel way or even a path from 13th street west to the ravine for long before the incident which gave rise to this action. Children of the neighborhood had used the ravine, the spring and the springhouse as a place to play even though plaintiffs and other parents had forbidden them, and even punished them, for going to the springhouse to play. This was generally known in the neighborhood and to some of the city officials. Even the police would sometimes see boys playing in the ravine about the springhouse and would drive them away; but they returned.

Lathrop Avenue does not extend west of 16th street. Plaintiffs lived on 16th street facing Lathrop Avenue. They were the parents of five children, all boys. The oldest, LeRoy, at the time of the tragedy was 10½ years of age. They had heard that the springhouse was a dangerous place for the children to play and had told their children not to go there. In the afternoon of September 18, 1949, LeRoy asked his mother if he and Oscar could go over to Bobby File's house to play, and she gave her consent. After the boys were at the File place awhile Bobby suggested that they go to the springhouse, and the boys concluded to go. There were four of them— LeRoy and Oscar Hendren, and Bobby, 9½ years old, and Clarence File, six years of age. When they got to the springhouse Clarence climbed up on top of it. The other boys were in the springhouse talking. They heard a crumbling. They started to run, and Oscar, who was at the back end of the room, was not able to get out. The cement roof fell on him inflicting fatal injuries.

The latter part of this statement is taken from the testimony rather than the pleadings.

In their petition, filed December 8, 1949, plaintiffs alleged the

situation with respect to the street, the ravine and the springhouse; that a part of the springhouse was situated on the street; that it was defective and in a dangerous condition, particularly the walls located on the street, which were out of repair and would no longer sustain the roof; that the street was in a densely populated section of the city made up of small dwellings on small tracts of ground which afforded the children in that vicinity few adequate places to play, as a result of which they used the street space and the springhouse as a place to play; that the springhouse and the rough wooded area comprising the street at that point were attractive to children and furnished an inviting hideout and camp for the children, and large numbers of them habitually played in and about the springhouse and on the slab resting on the top of the insecure and defective walls thereof; alleged the actual and constructive knowledge of the city of the condition of the springhouse and the fact that children were using it for a place to play, and that the city had been requested by the neighbors to repair or remove and abate the structure, but it had failed to do so; and it was alleged that because of these conditions the springhouse was a public nuisance, and that a proper claim for damages had been timely filed with the city, which had failed to make settlement thereof. Defendant filed an answer which contained a general denial except as to matters specifically admitted; admitted its corporate capacity; alleged that Lathrop Avenue had never been opened for travel through the large ravine; that it had no way of knowing that the springhouse was in a defective and dangerous condition, and if the condition existed, as alleged, the springhouse was on private property and the city would have no authority to remedy the condition; alleged that if the children went there they did not go as travelers upon the street but for the sole purpose of playing there; alleged in any event the springhouse was not dangerous to travelers on the street; and further alleged contributory negligence on the part of Oscar Hendren and of the plaintiffs. The reply contained a general denial of the new matter in the answer, specifically denied that the portion of the springhouse which caused the death of plaintiffs' son was on private property, and contained argumentative allegations with respect to the duty of the city in view of the fact that it had brought the property into the city limits and therefore had control of the streets and had notice of the condition of the springhouse, and alleged that defendant at no time had vacated any portion of Lathrop Avenue.

At the close of plaintiff's evidence the defendant filed a demurrer thereto and directed the court's attention to the following: (1) That there was no liability on the city to maintain an unopened and unimproved portion of the dedicated street. (2) That the portion of the street where the old springhouse was located was not opened nor used for travel as a public street and was not a street in contemplation of law, and therefore the duties and responsibilities imposed upon the city to keep pedestrians out of the street and to keep the street in a reasonably safe condition does not apply. (3) If it is assumed the unimproved and unopened portion of Lathrop Avenue where the springhouse is located is not a street but might be considered a part thereof, then the city claims that it is exculpated from liability because the existence of that unimproved portion of Lathrop Avenue is a governmental function. (4) That plaintiffs are debarred from recovery because of their contributory negligence.

In overruling the demurrer the court stated that the first question in the case was whether or not the springhouse was a nuisance attractive to children and likely to cause injury to them. *Second,* was it on a street in whole or in part? As to the first question the court stated:

"The first question is answered without any difficulty at all. There was evidence on that. It was a dangerous thing, but it seemed as though everybody understood it, even the City.

"Now, it is contended that because this street was not used as a trafficway that the City is not liable. I don't think that is the law. I think when the City takes over a street, they are obligated to take care of the whole street—perhaps not in every part the same as in every other part—but it is their obligation to at least keep that street free from being a public nuisance or a pitfall or trap, or anything of that kind. So I think there is evidence on that; partly on the street and partly on the private ground. And those are questions for the jury."

The court ruled that whether the city by its proper officers, agents and employees had actual and constructive notice of the situation, and also the question whether plaintiffs or their son who was killed were guilty of contributory negligence, were questions for the jury.

The trial court overruled defendant's demurrer to plaintiffs' evidence and defendant went forward with its evidence. That included a survey which disclosed that the springhouse did not sit square with the street. Its northeast corner was nine feet in the street and its northwest corner was six feet in the street. Other details of locality were shown and it was brought out that the city

never had improved that portion of Lathrop Avenue for travel. Many photographs were shown and explained.

There was quite a little colloquy among court and counsel as to the instructions and the special questions which should be submitted to the jury, in the course of which was the following:

Counsel for plaintiffs: "And we object to the refusal of the Court to give the instruction requested by the plaintiffs, and particularly the refusal of the Court to instruct on the question of public nuisance. We have alleged in our pleadings that a public nuisance did exist, and we think we have proved it a public nuisance under—as something that comes particularly under the governmental authority of the City.

"The Court: Well, if you want to know what I think about it, I don't think you have proven a public nuisance. . . . We are not interested in the public authority, at all. We are interested in whether there was a place there that was dangerous for children to play. We call it an attractive nuisance, but that is just a term. It is not a public nuisance, at all."

The court gave instructions covering all phases of the case predicated upon the attractive nuisance doctrine. With respect to the liability of the city the pertinent instructions read:

"14. The burden of proof is on the plaintiffs to prove by the preponderance of the evidence, substantially as alleged in their petition, that the defendant City, by its officers, agents or employees, was guilty of negligence in permitting the structure or springhouse in question to be and remain in Lathrop Avenue, in whole or in part, at the point in question: and that such negligence was the proximate cause of the death of their son, Oscar Hendren; and therefore, if these allegations are not so proven you will find for the defendant City."

The court also instructed the following:

"25. The defendant City by its officers, agents and employees having charge of streets, was required to exercise ordinary care and prudence to ascertain whether or not there existed any place or condition within the boundaries of a street which would be especially dangerous to persons upon such street, and children who might reasonably be expected to be attracted to such condition or place, and might suffer injury by reason thereof, and to guard against dangers, if any, resulting therefrom; . . .

"27. Mere proof, if any, of a dangerous place or condition within the boundaries of the street, substantially as alleged by the plaintiffs, would not create a liability against the defendant City for damages, unless it is further proven by the preponderance of the evidence that the defendant by its officers, agents or employees, having charge of streets, had actual notice or knowledge of such dangerous condition or place, and that children were in the habit of playing there, and thereby exposed to danger or injury, or that the same had existed for such a length of time before the injury and death of the plaintiffs' son, that they could and should have known thereof by the exercise of ordinary care and prudence, under all the circumstances—in other words, had constructive notice—in sufficient time before the injury and death of plaintiffs' son to have guarded against or prevented said injury and death by such care and prudence."

Other instructions defined and properly applied negligence, proximate cause, contributory negligence, burden of proof, and other questions presented by the record. The defendant made appropriate objections. The court submitted and the jury answered special questions as follows:

"1. If you find for the plaintiffs, then state in what the defendant was negligent. Answer: City negligent in not condemning, removing or destroying springhouse.

"2. Did the plaintiffs have knowledge of the conditions of the springhouse in question on the 18th day of September, 1949? Answer: Yes.

"3. If you answer the preceding question in the affirmative, did the plaintiffs, considering their knowledge of the conditions of the springhouse, exercise ordinary care and prudence to prevent Oscar Hendren from going to the springhouse? Answer: Yes.

"4. Did the City of Kansas City, Kansas, in the exercise of ordinary care and prudence have any reason to believe that there was anything wrong with the springhouse? Answer: Yes.

"5. Was that part of Lathrop Avenue where the springhouse was located used for ordinary public travel at the time said accident occurred? Answer: No.

"6. At the time of the accident was Oscar Hendren playing on: (a) Private property? No. (b) City Street? Yes. (c) Unknown? No.

"7. What acts, if any, did the City of Kansas City, Kansas, do to permit the existence of the springhouse complained of? Answer: None.

"8. Was Oscar Hendren's death directly and proximately caused by any of the following: (a) Solely negligence of the defendant City of Kansas City, Kansas? Yes. (b) Solely by plaintiff's negligence? No. (c) Solely by the negligence of Oscar Hendren? No. (d) Combined negligence of plaintiffs and defendant City of Kansas City, Kansas? No."

Question 10 pertained to the amount of the verdict, which is not questioned if plaintiffs are entitled to recover.

Defendant filed a motion to set aside the answers to questions Nos. 3, 4, 6 and 8 as not being supported by the evidence; also, a motion for judgment in its favor notwithstanding the general verdict; also, a motion for a new trial. All of these motions were considered by the court and overruled. The court approved the answers to the special questions and the general verdict. Defendant filed a timely appeal.

In this court counsel for appellant, with commendable industry and research, have argued questions to be determined by this court under seventeen separate headings and a conclusion which summarizes all of them. These separate headings in general pertain to three questions: *First,* counsel for appellant contend since plaintiffs pleaded that the springhouse was a public nuisance, which they failed to prove, the court should have rendered judgment for

defendant; that the issue of whether the springhouse was a public nuisance was not submitted to the jury; that the springhouse was not a public nuisance created and maintained or permitted by the city; that the city can only be held liable for a public nuisance which it creates and maintains, and that the court did not instruct on the issues raised by the pleadings. These contentions are more technical than substantial. The plaintiffs pleaded all the necessary facts, and somewhat as a conclusion characterized the springhouse and its environments as a public nuisance. Defendant answered as to the facts pleaded and in the course of the answer denied the existence of a public nuisance. Naturally the case had to be tried upon the facts presented by the pleadings. It is not very material whether the conclusion in the petition with respect to its being a public nuisance was established or not. We agree with the trial court that the case should be tried upon the facts pleaded without bothering the jury with the question as to whether it was a public nuisance. Doing so would have required detailed instructions on what constitutes a public nuisance, which would have been difficult for the jury to apply, and in fact would have been more confusing than helpful. The trial court pointed out that the real question was whether a dangerous situation existed there which was attractive to children and which the city, with actual knowledge and constructive notice, permitted to remain and to be used as a playground by the children. The court observed that such a situation is frequently termed an "attractive nuisance," which in fact is only a name. The *second* is somewhat related to the first. Counsel for appellant complain that they went to court prepared to defend on an allegation of the existence of a public nuisance and the court had no authority on its own motion to change the theory of the case. There was no real contention in the trial court, nor is there here, that defendant was seriously misled. It is clear counsel did not ask for time to amend their pleadings or to procure other evidence. More than that, it is hardly accurate to say that the court changed the theory of the case, as set out in the pleadings, for, as previously noted, the pleadings alleged the facts as they existed. Defendant answered as to those facts and pleaded others, which were controverted by the reply, and the parties were entitled to a trial upon those facts without regard to the general name given them in the pleadings. We think that was justified.

*Third,* and perhaps most important, counsel for appellant point out that Lathrop Avenue at the place in question was not open for

public travel and contend that the dedication of a street does not require the city to maintain the same as a public highway; that the opening or declining to open such a street is discretionary with the city, and that its acts in relation thereto are the exercise of governmental functions; that the attractive nuisance doctrine is based on negligence; that in performing its governmental function the city is not liable for negligence and therefore plaintiffs cannot recover in this action upon the doctrine of an attractive nuisance, which by its nature implies negligence. It is true the city did not have to improve all the street for public travel, and whether it did so or not was within the governmental function of the city. Indeed, the city might have vacated all or any part of Lathrop Avenue which it did not desire to use as a street. (G. S. 1949, 13-443.) However, that was not done. It is incorrect to say that the city cannot be held liable for an attractive nuisance on the unused portion of the street. The general rule in relation thereto is stated in 38 Am. Jur. 283, as follows:

"The doctrine of attractive nuisance applies to municipal corporations in so far as it is applicable in those cases in which municipal corporations are held to be liable for negligence, but, of course, can have no application in cases in which the negligence occurred or the attractive condition was created in the exercise of a governmental function. Ordinarily, if injury results as a consequence of an attractive nuisance created in the exercise of a private function of the municipality in a public place, such as a portion of a street or in a public park, there is no difficulty as to the liability of the municipality. A municipal corporation owning vacant lots or other land not devoted to a public use is chargeable with the same duties and obligations which devolve upon individuals in respect to their condition, and may be liable where it left unguarded a thing likely to attract or allure children thereto, . . . Ponds and sewer or drain openings have in some instances been held to be attractive nuisances for which municipal corporations were liable."

See, also, 65 C. J. S., Negligence, § 29 (10), where it is said:

"There may be liability for an injury caused by something attractive to children which has been placed in a public street or alley."

It can hardly be said that the city was acting under its governmental authority when it permitted the springhouse to remain on an unused portion of its street in the condition the evidence showed it to be.

Counsel for appellant contend that the springhouse was not an attractive nuisance. There was abundant evidence to show that it was, the jury found in harmony with that evidence and the finding has been approved by the trial court, hence we are not in position to disturb it.

Counsel for appellant also argue that the deceased and his parents were guilty of contributory negligence. There was conflicting evidence with respect to those matters. The court gave full instructions pertaining to them, to which no objection is now made. The jury specifically found that they were not guilty of contributory negligence and the court has approved those findings. We shall not disturb them.

Counsel for appellant complain of instructions of the court, particularly that part of instruction No. 25, previously quoted. We think when instruction No. 14 and instruction No. 27 are considered in connection with instruction No. 25 that there is no material error therein. There is a phrase in instruction No. 25 which, standing alone, might be too broadly construed, but it is accurate as applies to this case. We find no material error in the instruction.

Counsel for the respective parties have cited a number of authorities, all of which we have examined, but we think it not necessary to discuss each of them.

We find no material error in the record. The judgment of the trial court is affirmed.